Last case for today is 4090783, Walsh v. Mizan. For the appellant, is Ms. Desenphao? Correct. Is that pronounced correctly? Very close. Well, no, no, I've made a mistake, but I want to pronounce everyone correctly. How is it pronounced? Desenphao. Desen... Desenphao. Desenphao. Okay, I'll try my best. And for the advocate, Mr. Borton? Yes, sir. Okay, you may proceed. Thank you, Governor. We are here today on a motion for summary judgment. The issue on a motion for summary judgment is whether there's a question of material fact. In this case, we've got the best evidence available that there is a question of fact. We had a hung jury at 1130 at night on a Friday night. More specifically, after the hung jury, the defendants argued in a motion for summary judgment that the plaintiffs failed to establish proximate cause as a matter of law. Here, the defendants are arguing for motion for summary judgment, not on the basis that they are entitled to judgment on their own evidence, but instead they are claiming that the plaintiff cannot produce sufficient evidence to make out the elements of her case. And that theory was discussed by this court in this court's opinion in Plice v. Bosdeck. I think there are two other, or actually three other principles of Plice v. Bosdeck that are relevant to the court's decision today. First, summary judgment is a drastic means of resolving litigation. Second, all the evidence has to be construed in the light most favorable to the non-moving party. And finally, this court in Bosdeck noted that even if an expert notice testifies that there is a possibility of causation, that that is sufficient to overcome the defendant's burden of proving up evidence on a motion for summary judgment. So, with that in mind... What about the decision in Wiedenbeck that Mr. Borton cites where Justice Wilson, who, just so you know, I think has been the star of the Illinois judiciary, talked about how approximate cause must be established by expert testimony to a reasonable degree of medical certainty in the causal connection between treatment or delay, and a claimed injury must not be continued, speculative, or merely possible. So, that's the standard, isn't it? Well, Your Honor, as you said a little earlier today, I think that Wiedenbeck is distinguishable from this case because I think I have expert testimony which will show approximate cause. With regard to the statement of law, as far as Wiedenbeck first of all said that the plaintiff on motion for summary judgment has to prove that there was evidence arguably showing proximate cause. And that's what Wiedenbeck says. And on the facts of Wiedenbeck, the plaintiff in that case could never show proximate cause because her experts said unequivocally that they didn't know what a neurosurgeon would do. And in fact, in Wiedenbeck they argued that the plaintiff's experts said there should have been an earlier CT scan, and they couldn't say what the CT scan would say. I'm familiar with Wiedenbeck. Let me ask this counsel. This is a case I've really been reading and wrestling with. I'm the author in CLEIS, and I'm the one who's been trying to deal with these issues and figure this off. It seems to me CLEIS stands for the proposition that the trial court can't weigh conflicting testimony of expert witnesses. That was the fundamental problem which occurred in that case. To the extent that that's what we have here, you're right. The trial court can't weigh conflicting testimony of expert witnesses. But is that what we have here? I'm trying to, and I would like you to address it in this context. First, what is the, as the court in Wiedenbeck talked about, the standard of care that the medical, against which the medical professional's conduct must be measured, what was the violation of the standard of care in this case? What is your theory as to what did Dr. Meezan fail to do that he should have done? There were two issues that he didn't do. Number one, he didn't order a series of repeat ultrasound tests, Doppler study tests to look for blood clots in the legs. How many? There appears to be some dispute about whether he should have ordered a repeat or multiple repeats. Yes, Your Honor, you're correct. My expert, Dr. Jennison, was not always consistent on that point. At one point he said it should have been one repeat study. Other times he said two repeat studies. But it really doesn't matter because on motion for summary judgment, you have to interpret the evidence in a light most favorable to the plaintiff. So the fact that Dr. Jennison contradicted himself on that issue is irrelevant. So because of the fact that actually I think there's evidence of proximate cause on both the first study and the second study, although obviously it's more clear on the second ultrasound study because as even the trial court said in ruling on the motion for directed verdict, there was evidence out the wazoo about showing that certainly by July 12th, a Doppler study would have been positive, treatment could have been done, and Bill Walsh could have been here today. So there is that issue, and then there's the alternative theory of liability, which Dr. Jennison testified to is that Dr. Mizon should have prescribed prophylactic blood thinners after Bill Walsh was discharged from the hospital for a two-week period until he was going about his normal business. So we had two theories of liability. We had the ultrasounds and or the failure to prescribe. The second one concerned when Walsh was discharged from the hospital? Correct. That it should have been prescribed then and its failure to be prescribed was a deviation from the standard of care? Yes. Where is the then proximate cause testimony that linked these two alleged failures to the subsequent DVT that caused the death of Walsh? That subsequent testimony is first on page 29 of volume 10 of Dr. Jennison's testimony where he said that, I'm sorry, page 31 and 32. What did he say? He said that he gave his testimony that failure to either order a follow-up ultrasound study or to give a Lovenox, which are the blood thinners, was a proximate cause of Mr. Walsh's death. Do you have the transcript there of what he said? Yes, I do. Here, page 31 of the transcript. Doctor, do you have an opinion to a reasonable degree of medical certainty as to whether Dr. Meezan's failure to schedule Mr. Walsh for a follow-up ultrasound study a week after his admission or the failure to prescribe blood thinner medication was a proximate cause of Bill Walsh's death? Yes. Could you do that? Yes. I'm going to ask you to tell the jury what your opinion is. My opinion is that Mr. Walsh had deep vein thrombosis in a setting in which he had tremendous risk for that. He was admitted as a patient with suspicion of that. His suspicion for that continued because he was continuing to be immobilized and unable to walk. He needed to have the test, which is repeat ultrasound. It was reasonable to treat him with heparin, but to do neither was to leave it up to chance whether he could have recurrent DVT, and that's spread above the knee, recurrent pulmonary embolism, where he was at special risk because he had a history of pulmonary embolism in the past, and because pulmonary embolism can present a sudden death. So that was, I think, the actions Dr. Meezan took. The actions he didn't take actually were a proximate cause of Mr. Walsh's death. Also, at page 171 of Dr. Jennison's testimony, he said, if Mr. Walsh had been put on preventative blood thinners upon discharge or had been given Lovinox on July 4th as well as July 5th and 6th, then during those days when he was not up and about, do you have any opinion as to whether or not he would have had an episode of shortness of breath the night before? Answer, I wouldn't have a way of knowing exactly what the shortness of breath was due to, but I think more likely than not it was due to PE, and if he had, that's pulmonary embolism. If he had been on Lovinox, I think it's more likely than not he would not have had a pulmonary embolism. So there, very specifically... What did Judge Jones say about your second theory of deviation of standard of care, namely that he should have been prescribed this blood thinner? Your Honor, I put in my appendix the pages of where the judge talked about that, and he didn't resolve the issue. He left it up in the air. Had the jury been instructed as this as being a separate ground for finding of negligence? Yes. The two theories went to the jury. So that is why. Now there is... I'm also confused. You've changed, and I'm not sure of the significance of the change, with regard to whether there was a failure to order one or failure to order repeat tests, and in your opening statement you referred to just the one, not the repeat, and in your reply brief you say that it's improper for the defendant to rely on it. Well, I'm not sure why that is. It's not evidence, but it's an indication of what the position was of the plaintiff, certainly as late as making the opening statement. Was this because Dr. Jennison's, is that his name? Correct. Jennison, did his testimony change or surprise you, or what happened? I was surprised by his testimony. I mean, it wasn't... His cross did surprise me because that was not what I had anticipated. I suspect in the heat of cross he just, I don't know, got confused or whatever, particularly because of the fact that all the circumstantial evidence which was testified to by the experts, i.e. that the patient is most at risk when he is most immobile. That was the day he was released from the hospital and a couple days when he went home. That's when he had the most likelihood of getting those blood clots. That's what Dr. Jennison testified to, that's what Dr. Eddingfield testified to, etc. And the fact that there's also testimony that I wanted to have considered on motion for summary judgment was Dr. Wader, which was testimony indicating that, in fact, that these blood clots had been there for one to three weeks. And so, again, they had to have been caught. There was a reason why they would not have been caught initially because of his swelling. But as Dr. Oblonsky testified, once the swelling went down, then there would not have been that problem in trying to determine whether or not blood clots were in the calf or not. And that would have occurred by July 4th because his swelling had gone down. So there is expert testimony indicating from which an inference can be made that an ultrasound on July 4th or July 5th and certainly by July 12th would have shown the blood clots. Now, going back to your question about my opening statement. That, whatever I said in opening statement, is not an admission. It's not something that can be considered on summary judgment. And, in fact, in my reply brief, I cited a specific case, which indicates that, in fact, whatever one says in an opening statement is not finding. Well, that's right, but it's also a sign that you're changing theories. Yes, Your Honor. I would agree with that. What did Dr. Jennison say in his testimony that surprised you so that you had to change theories? He used the word speculation in the cross-examination. That's what surprised me because everything else that he had said. So why did that change theories about whether you needed repeat tests, repeat Dopplers, or one Doppler? That was not, actually, Dr. Jennison said repeat Doppler studies in his direct testimony. He also said it in his deposition. So that was not something, he said that all along. I, for whatever reason in my opening statement, just chose to focus on the first repeat study. But Dr. Jennison clearly said in his deposition, which we took a long time for the trial court to find at the trial court, where he had said that in his deposition, he said it several times in his direct testimony and was prevented from saying it more by the trial court's rulings. Why did you cite the American Thoracic Society guidelines and mention it to us on page 3 and 4 of your brief? Is that an issue you're raising on appeal? No. Then the judge kept it out. Why are you telling us that? Well, the reason why is because of the fact that those Thoracic Society guidelines supported Dr. Jennison's testimony that more than one repeat Doppler study had to be given. But you see, counsel, if that's been stricken, then it's not something we ought to be considering if the jury didn't hear and the judge didn't consider it. If you want to say it was an error, then raise that issue as an error. But rulings that are made and not appealed, we ought not consider what the ruling barred. I agree, Your Honor, except the only reason why I mentioned it is because of the fact that it furnishes further factual support for Dr. Jennison's testimony that a series of... It's not evidence. We're reviewing evidence in the record. This was barred by definition. It's not evidence. We're not going to consider it. Well, actually, it did come into evidence in the cross-examination of Dr. Eddingfield and in fact on motion for summary judgment as opposed to... I thought it was kept out by the judge. Was I mistaken in that? It was kept out in Dr. Jennison's testimony, but it came in Dr. Eddingfield's testimony. Dr. who? Eddingfield. He was their expert. So it came in. It was in evidence. But also, I think the more important point, this is a motion for summary judgment. In a motion for summary judgment, you're not limited to the trial court record. You can accept anything in the record itself on motion for summary judgment. And so that's why I mentioned it. Was it the most important thing? No, it's probably the least important thing I mentioned in the brief. I agree with that. So Dr. Jennison apparently at some point contradicted himself on cross to what he had said on the record? He did with regard to the issue of what... On direct, he said that an initial ultrasound study would have shown DVT. And he said that in cross. And then later on in the cross, he contradicted himself. But as the Supreme Court held in Gatlin v. Reuter, if an expert contradicts himself, that weighing of testimony cannot occur on a motion for summary judgment. That's Gatlin v. Reuter. And that clearly is applicable here because Dr. Jennison at one point in his testimony clearly said that on July 4th that he would have had DVT and blood clots would have been visible if the study had been done. A few pages later, he said it was speculation. So he did contradict himself. I have to acknowledge that. But that doesn't matter. That is, you know, as the Supreme Court said in Gatlin v. Reuter, that a trial court is not permitted to weigh testimony, even contradictory testimony by an expert on motion for summary judgment. And so for that reason, the fact that Dr. Jennison contradicted himself on that is irrelevant to the court's disposition of this motion for summary judgment. Thank you, Counsel. You have a chance to address this again in the panel. Thank you, Mr. Clark. May it please the Court. Counsel. We deposed Dr. Jennison with respect to what his criticisms were of Dr. Mizon in this case. At page 34 of his deposition, he indicated that he needed to do a Doppler within a week. That's what most physicians would do. Page 98 is the only reference where I missed it when we went through it. He said Doppler is S-plural. Then you go through the rest of the deposition. Even on page 98, he says Doppler. You've got to do a repeat Doppler within a week. After this deposition of Dr. Jennison takes place, we get a supplemental disclosure from plaintiff that says, what was required here was one Doppler within a week. That's what we think we're going to trial on is one Doppler within a week. She repeats that in opening statements. She shows them an algorithm that suggests maybe you have to do a repeat Doppler within a week. When we get to our cross-examination of Dr. Jennison in this case, that's where we start. Isn't it true that we comply with the standard of care here if we perform one Doppler within a week? He says, yeah, you're right. You would comply with the standard of care. Let me cut right to the chase of one other important thing on this point that you're now bringing up. Last point, I'm just asking counsel, what is the situation? Let's assume that he has contradicted himself. What is the situation regarding that as far as a jury trial is concerned in resolving this issue? Who does it, and is it something which we can say can result in either a directed verdict or a summary judgment? Or is it a matter for the jury to decide what do they believe, and was he confused, or what weight to give to this testimony? It's not a matter for the jury to decide. What case says that? Weidenbach. Weidenbach. As the gatekeeper, what the court is going to have to do is determine what the jury can decide with respect to that. Weidenbach was not a jury trial, was it? Weidenbach is a summary judgment case, and also Aguilera. But it never went to a jury. This one went to a jury, and if I read the briefs correctly, the only case cited that went to a jury was Aguilera? Aguilera went to a jury. It went to a jury, and then they had a motion of summary judgment. But I have difficulty understanding how summary judgment is proper where you have a hung jury. Your Honor, a hung jury under the case law is a nullity. It's as if it never happened. Just because one juror may be confused about an issue or may have decided something another way and hung this jury, and I'd love to tell you what I discussed with the jury, but it's not evidence, and I can't bring that in here. But just because one juror hung this thing up and wouldn't let it go to a verdict is not a reason that doesn't mean we aren't entitled to either a judgment or not a direct verdict for a summary judgment. Let me ask you, I want to go back to my other question. Let's assume that Dr. Jennison testified as he did at trial, and you confront him with a deposition where he said what he testified to at cross. Correct. You impeach him with his prior inconsistent statement from his deposition. Is his testimony now something which the jury can consider, the actual direct testimony? The direct testimony of two dopplers? Well, whatever he said. He's testified at trial to X. Right. You impeach him with a deposition where he said not X. I think here's where I'm getting at with respect to the summary judgment and why it gets taken from the jury and why the court can decide that. It's because when we get to the issue of proximate cause, we ask him point blank, do you have an opinion to a reasonable degree of medical certainty as to whether a repeat doppler on July 4, 5, or 6 would have revealed anything? At first he tries to say, yeah, you would have seen something, but then he goes through it and he goes, you know what? That's speculation. That's guesswork. I'm not being asked to guess or speculate. I can't make that proximate cause gap. I have no opinion to a reasonable degree. Counselor, you didn't answer my question about the deposition. Okay. Let me repeat it. Okay. Dr. Jennison testifies at trial to X, X being whatever the facts are he's testifying to. In his deposition he said non-X. You impeach him with it. Indeed, the very testimony, let's make it even clearer, let's assume that he testified at trial as he did and what you just cited to us was from deposition testimony, that you had deposed him and he had said about, oh, I'm not sure, it would be speculation. How? It's going to be stricken as to proximate cause and doesn't go to the jury. What's going to be stricken? The conclusions. You mean his direct testimony is no longer valid? His conclusions about proximate cause, when he comes out with the opinion of proximate cause in his direct testimony, which counsel just read, do you have an opinion whether or not that was a proximate cause of his injury, he says yes. That's the conclusion, which you see in Weidenbach, which you see in Aguilera. They all make it. They all make that conclusion, what Weidenbach and Aguilera say. Let me pause. Before he said what he did in cross-examination, was his testimony adequate to survive a direct verdict? Yes. So what you're saying is that his subsequent contradiction or disagreement or whatever it was eliminated the viability of his earlier testimony? It's not the contradiction. It's when he says there is no factual basis for that conclusion that I've just given. In Weidenbach, you can get to the jury. You can go in there with a proximate cause. Let me be more clear. That's the automobile accident case, what this is called by plaintiffs. It says, did you see the accident? Yes, I did. What did you see? I saw the green car go through the intersection, and the red car had the green light. The green car did not. On cross-examination. You're starting cross-examination because of the witnesses say, gee, I'm not so sure. You know, I think it was, you know, but I'm not as sure now as I was earlier. You know, I guess I really wasn't looking as carefully as I thought. Now what? Goes to wait. And it's different from our case. Who decides that? The jury gets that issue as to wait. So my question is, in a deposition context or a witness who testifies changing, why are we just dealing with questions of wait where impeachment has perhaps diminished the wait to be given to this testimony, but not its admissibility? Isn't what you're talking about really a question of admissibility for the jury to consider? It isn't. It isn't because under the teachings of Weidenbach, when you give those conclusions, that's a conclusion. But an expert opinion that's not supported by a factual basis is entitled to no wait. It's entitled to nothing, and it won't prevent summary judgment. That's what Weidenbach Aguilera teaches. And here the conclusion was, yes, there's proximate cause. But when and how is that adjudicated? It can be adjudicated on summary judgment, as in Weidenbach. Well, I mean, do you argue to the court, judge, this witness, his testimony is not admissible? Is that what your position is with regard to Dr. Jenison? What our position is is that his expert opinions and conclusions do not have a factual basis because they are based on speculation, conjecture, guesswork, his words, his own testimony. His conclusions are based on those things, and that can't support a case. Counsel, my problem, I'm trying to get you to focus on it here. That's why I asked the questions I did. On direct examination, you heard the quote from Ms. D'Souza of Dr. Jenison. Correct. It seems to me that that would have been good enough, had the case rested there, to get this case to the jury, wouldn't it? If you show on cross-examination. No, it doesn't. Tell me what wouldn't have been good enough on that testimony. Well, she can't get there on that testimony. That's my question. If the case ended there, you had no cross. If I had no cross, it goes to the jury. So if there's a cross-examination and the witness is now impeached, how does the impeachment go to anything other than the weight? Exactly. What you're talking about is you're saying I just impeached this guy. I didn't just impeach this guy. I showed that the foundation for his opinion and conclusion on proximate cause was guesswork, speculation, and had no foundation, as Weidenbach demonstrated. All of the experts in Weidenbach-Aguilera come out with this conclusion. It's directly related. If they had just done the CT scan, he would have survived this. We would have been able to save him. Chances of successive survival were more than 50% under Holden. That's what they all say initially. But when you get down to the cross-examination, you say, listen, if you perform this test, and these are all testing cases, you order that CT scan, what's going to happen? Well, I don't know if it's going to show hydrocephalus at the time you order it. What happened to the second theory of liability about the failure to give the blood thinner? It's an alternative. Okay. He comes up to us as an alternative. And what happened to it? It's irrelevant if it's an alternative. You can say that the standard of care... What do you mean by that? It's another way to comply with the standard of care if you don't want to do the Doppler. That's the way it's asked to him in direct testimony from counsel. She says, listen, if a doctor doesn't want to do a Doppler, is there an alternative way to comply with the standard of care? He says, yeah, you could do lovinase. He testifies at page 42. He says, so giving a low molecular weight heparin was a prophylaxis isn't going to hurt him. It probably helps some. But the key issue is follow-up with diagnostic study. The Doppler ultrasound, because the question that we care about most is, does the patient have a DVT plot above the knee? It's an alternative way. He could say another alternative way. Well, it seemed to me that the testimony that counsel read from page 31 established that there's a failure of the deviation from standard sound medical practice with regard to two things. It's one, Doppler test, and second on the day of discharge to give the blood test. Isn't that what he said? He said it's either or. You could do either one of these to comply with the standard of care. If either one complies with the standard of care, why am I supposed to do both? If I show there's a fatal flaw with what he says I'm supposed to do with respect to the standard of care one prong and there's some other alternative way to comply with the standard of care, I don't have to show that we comply with the standard of care every way possible. Was the jury instructed as to both of these grounds? They were instructed as to both grounds. Then it sounds like these were alternatives but also could have been filed on both. Isn't that? His testimony was changed from his deposition testimony. His testimony deposition is either or. When I ended up with him at trial, he said you could do either a Doppler within a week or you could do lovinox or you could do both. It's page 60 of volume 10. You could do both or either one. So I've got three different ways where I can comply with the standard of care. I don't have to do all of them. Our position is, Your Honor, that you have to have, and I think you hit the nail on the head, you have to have expert testimony to a reasonable degree of medical certainty to establish proximate cause in a medical malpractice case. What Weidenbach-Aguilera teaches is that if you're going to have these conclusions, you've got to have a basis for it. And when he testifies that it's speculation, guesswork, what a subsequent Doppler would show, then he's given away those conclusions. And Weidenbach-Aguilera indicates you're entitled to summary judgment, you're entitled to a directed verdict at that point in time. What about the other doctor's testimony that you said shouldn't be considered? What was his name? I'm not sure. I know the doctor's. It slipped my mind that she had originally withdrawn and then wished to. . . Oh, Weider, Dr. Weider. Why is that a problem? Why can't she do that? It's because he's irrelevant. I mean, the trial court hasn't stricken Weider. The trial court said, listen, I'm considering what Weider's got here on summary judgment, and Weider doesn't assist us on summary judgment. The reason he doesn't assist us on summary judgment is the only relevant thing he could potentially say is he's having pulmonary emboli one to three weeks before his date of death on July 13th. He can't tell us whether these pulmonary emboli were in him before he ever went to the hospital or a week before he went to the hospital. It's just as likely. Well, why is it in circumstantial evidence that it supports the plaintiff's theory? Because in a medical malpractice case, you can't rely on circumstantial evidence. You have to have expert testimony to a reasonable degree of medical certainty. That's what supports proximate cause in a medical malpractice case. And if it is just as likely that these pulmonary emboli were in him prior to his hospitalization as it was that they formed sometime afterwards, how can that go to a jury? It doesn't. The courts have said it's got to be more probable than not, and his testimony does not meet that burden. Counsel herself, when they abandoned Weider, said he's got no relevance to the issues relative to Dr. Mizon anymore and abandons him. Well, my trouble is when you say, when you talk about the summary judgment context, what troubles me about this is it sounds like the judge is doing an awful lot of evidence weighing. He's rejecting Dr. Weider, saying, well, it's not helpful. That's not the standard. It's not probative. It's not probative or relevant to the issues in the case. One of the things I tried to talk about in the Kleist case, and I don't think I got the message across very well, is this. Particularly when you're dealing with expert witnesses. What happened in that case is the judge weighed expert testimony. He found the defendant's experts far more convincing than the plaintiff's experts and found that, therefore, the plaintiffs had failed to establish a probable cause for whatever it was they were trying to approximate. As I tried to say there, in other cases we've talked about, it seems to me that your position with regard to the motion of summary judgment should be not to have a contested motion of summary judgment, but to strike the testimony and have it litigated. Because the idea ought to be this isn't admissible. And if it's admissible, then the jury gets to hear it. Isn't that how it should work? It could work that way. Well, but you didn't. I think that's not possible. Because I'm not sure. Then we have a court focused on the admissibility of testimony and avoiding the temptation to weigh it. I don't agree that the trial court weighed any testimony here. I do not think that's what the trial court did here. For instance, if it is your position, as it seems to be, that the testimony of Dr. Jenison on cross-examination so weakened his direct testimony as to render it no longer admissible, then you should have made a motion to strike. And it should have been litigated in the context of a motion to strike that testimony before the hearing of the motion of summary judgment. Because if we understood fully what your theory was, and if we had that before us and the court addressed it and said, you're right, I'm going to strike this testimony, then counsel has essentially got nothing left. Summary judgment easily follows from that. I followed Aguilera. That's what I followed. Aguilera says you're entitled to a judgment notwithstanding the verdict if you establish through your cross-examination. And that's what I did at trial. I moved from my directed verdict. I was going to get my directed verdict until the trial judge was shown the deposition testimony where it said Doppler is plural. And he goes, oh, no, I'm not going to grant summary judgment. Another Doppler would have picked it up at some time. The problem with that is we don't have an expert testimony that an initial Doppler would have picked it up because he says that's speculation and guesswork. And we don't have an opinion to a reasonable degree of medical certainty what a second Doppler would have shown either. There is no testimony from Dr. Jennison when this second Doppler is supposed to be performed. Counsel signs to the record and says it's supposed to be performed within a week and gives dates of July 5th and July 12th of when you're going to perform the two Dopplers. It's funny because we argued before the trial judge on the motion for summary judgment. She says no, it's July 4th and July 11th. She realized she made a fatal mistake because everyone concedes that all of these events could have happened within a 24-hour period of time. There is no testimony to a reasonable degree of medical certainty that the first Doppler would have shown anything because he's testified it's guesswork. There is no testimony, no disclosure, no deposition testimony, no trial testimony, no affidavit from Dr. Jennison to suggest that a second Doppler should have been performed on what date and what, if anything, that would have shown. And the trial court in its order of statement with respect to granting the motion for summary judgment indicated with respect to the defendant's doctor that they violated the standard of care and had he complied with what Dr. Getterin believes is the standard of care, we still don't know whether or not that would have been effective. That doesn't have in any way to deal with your question? No, it is a proximate cause standard of care. It's a proximate cause issue and summary judgment issue because it is speculation, guesswork, under Aguilera, Weidenbach, as to what a subsequent test would have shown. The CT in Weidenbach, we don't know if it's going to show hydrocephalus or if it's going to show anything that's going to lead to something that will lessen the injury. Just like here, if we do the Doppler study, as you suggest, a week later, we don't know that it's going to show anything that's going to lessen the injury. There's no testimony that a second Doppler is going to show any lessening. The trial court spoke of regret for having made a ruling keeping out some of the plaintiff's evidence that he said, in retrospect, he shouldn't have done. What was that about? That was about being shown page 98 of Dr. Jennison's deposition testimony where he said Doppler's plural in that one instance. He said, oh, I should have let him testify that multiple Dopplers were indicated, and that was why he denied the motion for directed verdict. But there is still not and never has been any testimony from Jennison that a second Doppler would have shown anything when it was supposed to be performed. Okay, thank you, Counselor. Any rebuttal? Okay. Your Honor, Wiedenbach is distinguishable because of the fact that those experts, the emergency room doctor and the neurologist, could not testify what a neurosurgeon would do. In this case, Dr. Jennison clearly said, he says it on page 104 of his testimony, that I can say that they would have seen clot above the knee on July 4th, 5th, and 6th. He says that in part of his cross-examination. That establishes that a first Doppler would have shown blood clot. Yes, later, a few pages later, he says that is speculation. However, as this... How should we deal with it? You look at Gatlin v. Ruder, what the Supreme Court said in that case. And in that case, there was directly contradictory testimony by a Dr. Niswander. And the Supreme Court said, we hold that an issue of material fact with regard to Ruder's negligence arose as a result of Niswander's deposition. Our duty is not to judge the strength of Niswander's deposition as evidence, or to weigh the credentials, credibility, or testimony of Niswander against those of Ruder and Raimondi. We must decide whether Niswander's deposition presented evidence that Ruder may have proximately caused Gatlin's injuries. That's what the Supreme Court said in Gatlin v. Ruder. You don't weigh testimony on motion for summary judgment. That's what defense counsel is trying to suggest here. And that's what the trial court acknowledged it was doing in its motion for summary judgment. It was weighing Dr. Jenison's testimony. The trial court didn't acknowledge that. Where did it say that? It said that... What the trial court said is that there was some evidence of Dr. Jenison's testimony that favors the plaintiff and would easily survive the motion for summary judgment, and that there was other testimony by Dr. Jenison that would favor the defendant's side. And that's where he said that. He said that, and I have it in the appendix to my brief. I've seen it, but I didn't see... He never said, I'm weighing the evidence. No, he didn't say that. What he said was that he said he thought that the... He thought that Dr. Jenison fatally contradicted himself. Did you cite Gatlin to the trial court? No, I did not. Only us? You're right. I should have. But there is de novo review on motion for summary judgment. Because Gatlin is dispositive. With regard to the question of what a second Doppler would say, the trial court clearly said in the trial that there was all sorts of evidence that a second Doppler would have shown that. And we know that. We know that because... Say that again. There was all sorts of evidence of what? That there was plenty of evidence that a second Doppler study, i.e. done a day or two before he died, would have shown blood clots. And so clearly the second Doppler would have shown it. With regard to Lovenox, defense counsel has presented no case law, no record evidence, which shows that alternative theories cannot be used on motion for summary judgment or directed verdict at trial. Directed verdict at trial, if you're going to survive that, you have to show that there's no evidence on theory A and there's no evidence on theory B. That hasn't been shown here. There's no testimony that rebuts, that fatally rebuts Dr. Jenison's testimony that the standard of care could be met by either doing follow-up Doppler studies or Lovenox. Either way. And that is not rebutted. And so I think, Your Honor, there is also, with regard to Dr. Jenison's failure to say that the second Doppler study, that was the evidence that was prevented, but it would be Mr. Borden's burden of proof to show that plaintiff could not come up with that evidence. And that isn't so. There is, as I said, and this Court has acknowledged, abundant circumstantial evidence in this record. Thank you, Counsel. Your time is up. We'll take this matter under advisory to be in recess. Thank you.